**UNITED STATES of America**

v.

**Michael A. INTERBARTOLO.**

**UNITED STATES of America**

v.

**Stephen J. SARDINA.**

**Cr. Nos. 60-50-J, 60-53-J.**

United States District Court
D. Massachusetts.
March 7, 1961.

Elliot L. Richardson, U. S. Atty., Arlyne F. Hassett, Asst. U. S. Atty., Boston, Mass., for the United States.

DiMento & Sullivan, Francis J. DiMento, Boston, Mass., for defendants Interbartolo and Sardina.

JULIAN, District Judge.

Each defendant filed a motion for the return of property alleged to have been seized illegally from his person and from his automobile by government officers and to suppress the use of such property, and of admissions alleged to have been illegally obtained from him, as evidence against him in any criminal proceeding. Interbartolo's motion also includes property allegedly taken from premises in which he was present.

The motions were heard together.

On October 30, 1959, Deputy United States Marshal Mahoney, in conjunction with special agents of the Intelligence

Division of the Internal Revenue Service, conducted a raid at Chick's Bargain Shoe Store in East Boston. The raid had been planned by members of the Intelligence Division and was carried out under their supervision.

Chick's Bargain Shoe Store is located on the ground floor of a three-story building on Meridian Street near the intersection of Meridian and Havre Streets. The front entrance to the store is on Meridian Street. The back door is on Havre Street.

On the morning of October 30, 1959, special agent Sawtelle applied to the United States Commissioner for a search warrant for Chick's Bargain Shoe Store and for several warrants of arrest.

Before he was sworn, Sawtelle orally informed the Commissioner that special agents of the Intelligence Division had conducted surveillances in the vicinity of Chick's and at other locations in East Boston during the preceding three weeks from October 6 to 29, 1959. Sawtelle stated that he personally observed number pool wagers being placed at various locations in East Boston. In each instance original betting slips were put in white envelopes and, at more or less regular intervals each day, one Ralph De-Angelis collected the envelopes and brought them to Chick's Bargain Shoe Store. On October 21, 1959, Sawtelle observed DeAngelis enter Chick's. He looked through the open slats of the venetian blind that covered the show window on the front of the store and saw DeAngelis, the defendants Interbartolo and Sardina, and other persons grouped around a table with betting slips and envelopes spread out before them.

Observations made in the vicinity of Chick's indicated that between the hours of 12:30 and 3:30 p. m., daily, a steady stream of traffic converged on Chick's Bargain Shoe Store. On several occasions during the first week of surveillance two men were observed near the intersection of Meridian and Havre Streets making collections from passing motor vehicles and bringing them into Chick's. Several automobiles were observed parked in the vicinity of the store at about the same time each day. One of these automobiles, a Chevrolet sedan, 1959 Mass. Reg. No. 664822, was registered to the defendant Interbartolo; another, a Buick sedan, 1959 Mass. Reg. No. X–2194, was registered to the defendant Sardina, who was identified by Sawtelle as the operator of the car with registration number X–2194. Sardina parked his automobile on Meridian Street in front of Chick's and was frequently observed carrying wagering materials into the store. On one occasion, Sardina parked near a variety store and delivered wagering materials to DeAngelis who, in turn, delivered them to Chick's. The defendant Interbartolo was identified by Sawtelle as the operator of the car with registration number 664822. Interbartolo spent long periods of time at Chick's during the day. He frequently parked his automobile on Havre Street in the vicinity of the store's back door. On rare occasions he was seen carrying wagering materials.

After giving the Commissioner oral information, Sawtelle swore before him and signed in his presence a complaint which charged Richard Roe,

> "white male, about 38 to 42 years of age, about 5'8" or 5'9" tall, about 160 lbs., long nose, medium complexion, brown hair, frequently observed driving Chevrolet Impala Sedan, Mass. Reg. 664822, * * * "

with violation of 26 U.S.C. § 7203. The complaint alleged,

> "The undersigned complainant being duly sworn states: That between on or about October 6, 1959, and on or about October 29, 1959, inclusive, at East Boston, in the District of Massachusetts, Richard Roe, above-described, did engage in the business of accepting wagers, as defined in 26 U.S.C. [§] 4421, and did engage in receiving wagers for or on behalf of a person liable for the tax on wagers imposed by 26 U.S.C. [§] 4401, having wilfully fail-

ed, prior to engaging in said business and receiving said wagers, to pay the special occupational tax as required by 26 U.S.C. [§] 4411, due and owing to the United States for the year ending June 30, 1960; in violation of 26 U.S.C. [§] 7203."

Beneath this paragraph and above Sawtelle's signature the following assertion appeared:

"The above statements are made upon the personal knowledge of the undersigned."

On this complaint the Commissioner, on October 30, 1959, issued a warrant for the arrest of Richard Roe. The warrant was directed against the defendant Interbartolo.

Sawtelle executed in like manner another complaint which charged one John Doe,

"white male, about 45 to 48 years of age, about 5'8" tall, about 160 to 170 lbs., long nose, sharp features, frequently observed driving black and beige Buick Sedan, Mass. Reg. X2194, * * *"

with violation of 26 U.S.C. § 7203. The complaint alleged,

"The undersigned complainant being duly sworn states: That between on or about October 15, 1959, and on or about October 29, 1959, inclusive, at East Boston, in the District of Massachusetts, John Doe, above-described, did engage in the business of accepting wagers, as defined in 26 U.S.C. [§] 4421, and did engage in receiving wagers for or on behalf of a person liable for the tax on wagers imposed by 26 U.S.C. [§] 4401, having wilfully failed, prior to engaging in said business and receiving said wagers, to pay the special occupational tax as required by 26 U.S.C. [§] 4411, due and owing to the United States for the year ending June 30, 1960; in violation of 26 U.S.C. [§] 7203."

This complaint contained the same assertion, namely:

"The above statements are made upon the personal knowledge of the undersigned."

A warrant for the arrest of John Doe was issued by the Commissioner on October 30, 1959. The warrant was directed against the defendant Sardina.

The Commissioner at the same time also issued a search warrant for Chick's Bargain Shoe Store and warrants for the arrest of other persons.

The defendants do not question the validity of the search warrant.

No search warrant was applied for or issued for the Interbartolo or Sardina automobile.

A list of the automobiles to be seized by agents of the Intelligence Division under 26 U.S.C. § 7302 was prepared at least 24 hours before the raid. The Interbartolo and Sardina cars were included in the list.

Specific functions were assigned to the several agents participating in the raid. Group assistant Pastore was in charge of the raid. Special agent DeLuca was to be in charge of operations inside the store when Pastore was not present. Special agent Sawtelle was placed in charge of the interrogation of persons found on the premises. Special agent Daley was to be in charge of the "street detail" that was to seize the automobiles described in the list.

The defendants concede for the purposes of this hearing that authority to seize any property subject to forfeiture to the United States under any provision of title 26 U.S.C. had been delegated by the Secretary of the Treasury to the agents of the Internal Revenue Service.

On the morning of October 30, 1959, press, radio, and television representatives were notified by the Internal Revenue Service that a raid was planned for that afternoon. Approximately 30 newsmen met with special agents of the Intelligence Division in the parking lot of the Howard Johnson's Restaurant at Wellington Circle in Medford at 12:15 p. m. and were briefed. After lunch the agents and newsmen proceeded by prede-

termined routes to Chick's. They arrived at Chick's at approximately 2 p. m.

Deputy marshal Mahoney and special agent Sawtelle entered the back door of Chick's at 2 p. m. The door was unlocked. No force was required to open it.

Eight men, including the defendant Interbartolo, were in the store when Mahoney entered.

Mahoney held a badge in his right hand and the search warrant in his left hand. Immediately after entering the premises he said,

> "I am the United States marshal. I have some federal officers. There are federal officers with me. And I have a search warrant for the premises. Now fellows, stay put until we get this thing cleared up."

At the same time, Pastore, DeLuca, and special agent Gretsky entered Chick's through the front door.

Deputy marshals stationed themselves at the front and rear doors. A deputy marshal remained at each door throughout the afternoon.

The store, approximately 20 by 12 feet, was barren of furniture, merchandise, and equipment commonly associated with a shoe store or any other type of store. It contained three small tables, several chairs, one telephone, and a trash barrel.

In addition to the search warrant, Mahoney had several warrants of arrest in his possession, including the "Richard Roe" and "John Doe" warrants described above.

The premises were crowded and noisy. The defendant stood with some other men against the back wall of the store. He observed the search being made. He watched while special agents Sawtelle and Gretsky interrogated and searched each of the other men found in the store. He observed Pirrello (a defendant in a companion case), who had come in from the street with other special agents, interrogated and searched.

The search was completed at approximately 2:20 p. m. None of the men searched and interrogated, with the exception of two construction workers and a gas-station attendant, requested or was allowed to leave. Somewhat later, a fourth man named Faretra was given permission to leave after satisfying special agent DeLuca that the betting slips found on his person were for bets placed by himself.

Interbartolo was not told that he was free to leave. He was not told that he could refuse to answer questions or to submit to a search. Believing that he was not at liberty to leave before being interviewed and that he had to comply with all requests made by the federal officers, Interbartolo permitted himself to be interrogated by DeLuca. At DeLuca's request he went to the other side of the room and emptied the contents of his pockets on a chair. The items were inventoried by DeLuca and consisted of wagering slips, car keys, and $170 in cash.

After the interrogation and the search had been completed Interbartolo remained on the premises until 4 p. m. when, together with several arrested persons and suspects, he was taken in the marshal's van to the Federal Building in Boston.

The "Richard Roe" warrant for Interbartolo's arrest was never served and was returned unexecuted to the United States Commissioner. Mahoney did not in fact arrest the defendant. The government offered no evidence to show why Mahoney did not execute the warrant. Later on the same day, and while he was still in custody, Interbartolo was arrested under a true-name warrant alleging a violation of 26 U.S.C. § 7203. This arrest, however, was made after Interbartolo had been interrogated and told to empty his pockets.

The circumstances in which Interbartolo was interrogated and told to empty his pockets were substantially similar to those found by Judge Wyzanski in the companion case, United States v. Louis Festa, D.C.D.Mass., 192 F.Supp. 160, in which he said:

"In Festa's case it is plain that he was under arrest. The proclamation of the deputy marshal, the posting of guards at the doors, the Treasury agents' action in holding the men until they had been interrogated, and the escort imposed on persons going to the toilet show that Festa was under arrest."

Louis Festa was in the store with the defendant at the start of the raid, and while Interbartolo did not ask to go to the toilet with Festa and Pirrello, he was present when these men were escorted out of the store.

Although no one told Interbartolo he was under arrest or informed him that there was a warrant outstanding for his arrest I find that he had reason to believe and did in fact believe that he had been arrested and was being detained for questioning and search by the agents.

■■ Interbartolo's arrest cannot be justified on the ground that a "Richard Roe" warrant was then outstanding. No officer authorized to make an arrest took any action to execute the warrant. Neither DeLuca nor any other agent of the Internal Revenue Service had the power to execute the warrant. Since the arrest was unlawful, the search incidental thereto was also unlawful and the property seized as the result of such search was illegally seized and is therefore not admissible in evidence against Interbartolo.

At approximately 2:30 p. m. special agent Ferrick, who was part of the "street detail," saw Sardina driving his Buick sedan bearing Massachusetts 1959 registration number X–2194, on Havre Street. Ferrick had been instructed to seize the automobile if seen in the vicinity of Chick's. As the car neared the back door to Chick's it slowed down as if coming to a stop. Ferrick stepped into the street and motioned Sardina to stop the car. Special agent Moulaison, who had been standing on the opposite side of the street, joined Ferrick. When the car came to a stop both men ap-

proached the driver. Ferrick told Sardina that the automobile was being seized for violation of the wagering tax laws and thereupon proceeded to tag the car and to spray its windshield with an opaque liquid substance.

Moulaison identified himself as a special agent of the Internal Revenue Service and asked the driver if he was Mr. Sardina. It is not clear whether Sardina said "yes" or made no reply. Moulaison informed Sardina that a raid was being conducted at Chick's and that he thought the marshal had a warrant for his arrest. Moulaison then asked Sardina if he would accompany him to the store. Sardina got out of the car and went with Moulaison to the back door of Chick's. From the car to the door Moulaison walked slightly ahead of Sardina.

Access through the back door was obstructed by three or four men and there was some commotion there. Moulaison turned to Sardina and said, "We may just as well go around and come in the Meridian Street door." The distance from the rear door to the front door was about 50 or 60 feet. As they started for the front door Moulaison, to keep from jostling Sardina, placed his hand on Sardina's arm for two or three seconds and then removed it. The two men then walked the rest of the way side by side. Moulaison opened the door and announced, "This is Stephen Sardina." Sardina stepped inside. Moulaison did not enter. He returned to the street detail.

DeLuca, who had been standing near the door, heard Moulaison and pointed out Sardina to Mahoney, reminding the latter that he had a warrant for Sardina's arrest. Mahoney identified himself as deputy United States marshal to Sardina and informed him that he had a warrant for his arrest. Sardina acknowledged his identity. Mahoney showed him the "John Doe" warrant and ordered him to empty his pockets. Sardina made no move to comply. DeLuca, who had been observing the two men, thereupon turned to Sardina and told him to empty his pockets. Sardina reluctantly did as he was told. He obeyed be-

cause he believed the federal officers had the right and the power to exact obedience. The contents of his pockets included $4,778 in currency, a small black book, and wagering slips. These were inventoried, placed in an envelope, and turned over to Mahoney. Sardina was not under restraint at any time before he was arrested by Mahoney on the warrant.

■ Later that day, while he was still in custody in the Federal Building, Boston, Sardina was arrested by another deputy United States marshal under a true-name warrant. Informed of the second arrest, Mahoney made the following return on the "John Doe" warrant:

> "Received October 30, 1959 * * * returned without service as the within John Doe was arrested on another warrant under his true name, Stephen J. Sardina."

No evidence was offered by the government to explain the discrepancy between Mahoney's return and the uncontroverted testimony of Mahoney himself and special agent DeLuca that the warrant was in fact served on Sardina shortly after 2:30 p. m. at Chick's Bargain Shoe Store. Notwithstanding Mahoney's return I find that the "John Doe" warrant for Sardina's arrest was executed.

■ Sardina contends that he was arrested when Ferrick stopped his car on Havre Street. He relies on Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134. The holding in that case is inapplicable to the facts of this case. Here the agents were exercising their admitted authority to seize Sardina's car under 26 U.S.C. § 7302. They could not seize it without first stopping it. Since the car was on a public way there was no legal requirement for a search warrant or other legal process. The agents did not stop the car for the purpose of arresting Sardina or of searching the car. Sardina was expressly told that his car was being seized for violation of the wagering tax laws. He was also told that it was the marshal in Chick's who had a warrant for his arrest.

He had no reason to believe that the agents were arresting him.

Sardina further contends that the warrant for his arrest was invalid because it was issued on a complaint that was fatally defective.

■ Under Rules 3 and 4 of the Federal Rules of Criminal Procedure, 18 U. S.C. an arrest warrant may issue only upon a written and sworn complaint setting forth the essential facts constituting the offense charged and showing that there is probable cause to believe that the offense charged has been committed and that the defendant has committed it. The "John Doe" complaint does set forth the essential facts constituting the offense charged. The complaint, however, does not set forth facts showing that there was probable cause to believe that the offense charged has been committed and that the defendant has committed it. The oral information given by Sawtelle to the Commissioner before the warrant of arrest was issued cannot be invoked to buttress the complaint. The Supreme Court has distinctly held that an adequate basis for a finding of probable cause by the Commissioner has to appear on the face of the complaint. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503. Referring to Rules 3 and 4 the Court stated (357 U.S. at pages 485–486, 78 S.Ct. at page 1249): "The provisions of these Rules must be read in light of the constitutional requirements they implement. The language of the Fourth Amendment that ' * * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing * * * the persons or things to be seized * * *,' of course applies to arrest as well as search warrants. * * The protection afforded by these Rules, when they are viewed against their constitutional background, is that the inferences from the facts which lead to the complaint ' * * * be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' "

From the evidence adduced at the hearing it is quite clear that Sawtelle had conducted a prolonged surveillance of the activities that centered at Chick's Bargain Shoe Store and had acquired personal knowledge of the activities of the defendant Sardina. It would have been a relatively easy matter to have made a concise summary of what he had learned and to have incorporated it into the complaint, instead of reciting in effect no more than the bare elements of the crime as was done in Giordenello. The government, however, for some undisclosed reason chose not to do this.

■ Apart from information he may have received from sources outside the complaint the Commissioner, in view of the decision in United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L. Ed.2d 1394, could not have determined on the basis of information contained in the complaint whether there was probable cause for the issuance of the warrant. It is clear, for example, that he had to accept the mere conclusion of the complainant that Sardina had engaged in the business of accepting wagers and was not merely a so-called "pick-up" man. The warrant of arrest in the case against Sardina was therefore invalid. The arrest of Sardina and the search incidental to the arrest were consequently unlawful.

The defendants have not contended in this proceeding, nor does the evidence show, that the seizure of the defendants' cars was illegal. Since both cars were on public ways at the time they were seized there was no necessity for a search warrant. Sanders v. United States, 5 Cir., 1953, 201 F.2d 158; United States v. Carey, 5 Cir., 1959, 272 F.2d 492.

■ The automobiles having been properly seized under 26 U.S.C. § 7302, it was permissible for the agents as an incident of the seizure to open the doors and trunks of the cars, forcibly if necessary, in order to inventory the contents and to remove them to a secure place before the cars were towed and stored away pending the filing of libels for their forfeiture. If in the course of examining the contents, evidence was found that tends to incriminate the owner or the driver, there appears to be no sound reason for holding that such evidence was illegally obtained and should be suppressed, absent a showing that the seizure under the statute was a mere pretext to gain access to the contents of the automobile. No such showing was made in this case.

■ The defendants have moved not only to have the illegally obtained property suppressed as evidence in the criminal proceedings but also to have it restored to them. Rule 41(e) of the Federal Rules of Criminal Procedure provides: "If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial." Title 26 U.S.C. § 7302 provides: "it shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property." Section 7302 applies to property, including currency, used in violating the federal wagering tax laws, even if seized through an illegal search. Since this property is subject to forfeiture it cannot be returned pending the determination of any libel filed by the government to enforce the forfeiture. United States v. Macri, D.C.Conn.1960, 185 F.Supp. 144.

The following disposition is made of the motion in each case:

(a) The part of the motion which seeks to suppress evidence of admissions that may have been made by the defendant during the period of his unlawful detention is denied without prejudice to his right to object to such evidence on any valid ground when it is offered by the government at the trial.

(b) With reference to the property seized as the result of the search made as an incident of the unlawful arrest, the motion to suppress is granted.

(c) As to the property found in the defendant's automobile after it was seized under 26 U.S.C. § 7302, the motion is denied.

(d) The part of the motion which seeks the return of property is denied without prejudice to any defenses the defendant may assert in any libel proceedings.

The portion of Interbartolo's motion which asks for the suppression as evidence and the return of the property seized on the premises pursuant to the search warrant, is denied.