UNITED STATES of America
v.
$1,058.00 IN UNITED STATES CURRENCY.

UNITED STATES of America
v.
$2,007.43 IN UNITED STATES CURRENCY and $440.10 in Checks and Money Orders.

UNITED STATES of America
v.
$492.00 IN UNITED STATES CURRENCY.

UNITED STATES of America
v.
$395.96 IN UNITED STATES CURRENCY and a $25 Check.

UNITED STATES of America
v.
Joseph SHECK.

UNITED STATES of America
v.
Meyer SIGAL.

UNITED STATES of America
v.
Nathan GRANOFF.

UNITED STATES of America
v.
Abe RABINOVITZ.

Civ. Nos. 62-223—62-226;
Transcript Nos. 61-324—61-327.

United States District Court
W. D. Pennsylvania.
Sept. 13, 1962.

21. Cf. Guerrini v. United States, 167 F.2d 352, 356 (2d Cir.), cert. denied, 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393 (1948).

Samuel Reich, Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

Louis C. Glasso, M. Barney Cohen, Pittsburgh, Pa., for defendants Joseph Sheck, Meyer Sigal and Nathan Granoff.

John R. Gavin, Pittsburgh, Pa., for defendant, Abe Rabinovitz.

MARSH, District Judge.

These four libel proceedings brought under § 7302, Title 26 U.S.C.A., to perfect forfeiture of the currency and checks described in the captions, were consolidated for trial.[1] At the trial counsel agreed that on the basis of the record made in the civil forfeiture cases the court should rule on the four motions to suppress evidence made by the claimants Sheck, Sigal, Granoff and Rabinovitz, all of whom were arrested and bound over for grand jury action.[2]

The libels allege that on November 20, 1961, the Assistant Regional Commissioner, Intelligence, Internal Revenue Service, Philadelphia Region, acting through his duly authorized agents, seized the currency and checks involved which were intended for use and had been used in violation of §§ 4411, 4412, 4901, Title 26 U.S.C.A. These sections of the Internal Revenue Code require those engaged in the business of accepting wagers to pay a special tax of $50.00 and register with the official in charge of the Internal Revenue District.

Claimant Rabinovitz filed an answer admitting the seizure from him of currency and a check, but denying the other material allegations of the libel; the claimants Sheck, Sigal and Granoff did not answer the libels but appeared on the continued return day in opposition to the forfeiture proceedings and in support of their motions to suppress.

1. At Misc. Nos. 2854, 2855 and 2856, on proceedings initiated by Sheck, Granoff and Sigal, Judge Sorg ordered the Government to institute forfeiture proceedings or return the seized money and checks.

2. No evidence was introduced in support of the libel at Civil Action No. 62–225, and it was stipulated that the money taken from the person of Joseph W. Sheck pursuant to his arrest may be suppressed as evidence. Accordingly, that libel was dismissed, the money was ordered returned to claimant Sheck and suppressed as evidence in all criminal proceedings, the complaint at Transcript No. 61–324 was dismissed, and defendant Sheck was released from bond and custody.

None of the claimants offered evidence except Rabinovitz; he did not testify but offered some evidence relative to records pertaining to his payment of the special tax and excise tax under the wagering laws.

The evidence discloses that on September 11, 1961, James A. Taylor, a senior criminal investigator for the Alcohol and Tobacco Tax Division of the Internal Revenue Service, pursuant to orders, began an undercover surveillance of Whitey's Luncheonette, a combination restaurant and poolroom operated by Joseph Sheck at 1618 Center Avenue, Pittsburgh, Pennsylvania. On September 25, 1961, Taylor was joined by Harold J. Boone, also a senior criminal investigator, and from that date through November 21, 1961, Whitey's was under observation many mornings and afternoons by these agents. Their surveillance was conducted under the direction and supervision of Robert J. Madden, a special agent in the Intelligence Division of the Internal Revenue Service, to whom they reported. Their purpose was to obtain information regarding violation of the wagering tax laws by the claimants and others.

In the course of the investigation the agents made wagers by purchasing "numbers" from various numbers writers in the area surrounding Whitey's, an area known as the "Hill District". During the surveillance of Whitey's, the agents frequently observed that in the afternoon some of these writers from whom they had purchased numbers, and others known to them as "writers" or "pick-up men", entered the premises and gave money and packs of numbers slips to Rabinovitz and, on occasion, to Granoff. At times checks were included in the deliveries. The amount received from each writer was noted on the back of "waitresses' checks", the writer being identified by code. Rabinovitz and Granoff habitually put the money and checks in their pockets and the slips were placed in a bag which was usually given to "Freddy", an employee of Whitey's, who at about 3:30 P. M. removed them

from the premises. Rabinovitz regularly turned money over to Granoff and to Sigal when he was present; Sigal also received money from writers coming to Whitey's and habitually put the money he received from Rabinovitz and the writers in his pocket.

In addition the agents overheard conversations between the claimants and others connected with the wagering business clearly indicating that Sigal, assisted by Granoff and Rabinovitz, was operating a numbers lottery or "book" in competition with another "book" referred to as the 5th Avenue Bank; that several writers were working for Sigal on a commission basis, and that Sigal "had a six hundred dollar payroll to take care of writers' problems". They also heard Sigal give permission to one Goode to operate a numbers station in the area.

During the surveillance the agents frequently observed that in the morning Sigal, Granoff, and Rabinovitz discussed bets previously made, worked on adding machine tapes, and stuffed money into bank-type envelopes which were usually stored near the telephone and sometimes put into the cash register or behind the counter.

On November 20, 1961, in the afternoon prior to 3:00 P. M., the agents saw all the claimants in Whitey's. As previously observed, writers and pick-up men were turning in money, checks, and numbers slips to Rabinovitz who noted the amounts and put the money and checks into his pocket. On two occasions he turned over money and checks to Sigal, and on at least one occasion turned over money to Granoff. Sigal and Granoff put the money and checks received from Rabinovitz into their pockets and were not seen transferring these items to any other person. Rabinovitz was not seen transferring money or checks to any person other than Sigal and Granoff.

At about 3:00 P. M., according to prearranged plan, Whitey's was raided by Agent Madden, assisted by other revenue agents, including agents in the Alcohol and Tobacco Tax Division. Madden had

a search warrant for gambling paraphernalia in Whitey's and arrest warrants for Sigal, Granoff, and "John Doe", the last physically describing Rabinovitz and stating that he was known as "Piggy". This description and nickname identified Rabinovitz with reasonable certainty and sufficiently fulfilled the requirements of the Fourth Amendment to the Constitution. West v. Cabell, 153 U.S. 78, 14 S.Ct. 752, 38 L.Ed. 643 (1894).[3]

Madden executed the search warrant and personally arrested Sigal, Granoff and Rabinovitz; subsequently he made the returns on the arrest warrants and the search warrant. These claimants were searched by Madden incident to their arrests, and currency and checks on their persons were seized. The sum of $2,007.43 was taken from Sigal's pocket along with $440.10 in checks and money orders. The sum of $395.96 and one check for $25.00 was taken from Rabinovitz's pocket. The sum of $1,058.00 was taken from Granoff, $640.00 from his pocket and $418.00 from his wallet.

The search of the premises revealed six packs of numbers slips in an onion bin in the kitchen, one pack of numbers slips in a cuspidor, tapes in the front phone booth, and tip sheets in the areaway between the restaurant and poolroom. These items were seized.[4]

The next day at Whitey's Agent Taylor overheard Sigal express concern over the checks which were seized in the raid, and he wanted those who had turned them in to go to the people who had given them the checks "and get a story as to how they came into their possession and that would give him an explanation as to why he had them."

From the evidence and reasonable inferences arising therefrom, it is obvious that Whitey's was a primary turn-in station for a large scale numbers operation, and that Sigal was a principal assisted by Granoff and Rabinovitz in operating a segment of it. Regularly, wagers were received totaling substantial amounts from various writers who were identified by symbols for bookkeeping purposes; numbers slips were tallied; daily the numbers slips were taken from the premises to an unknown place; and in the morning adding machine tapes were present and envelopes were stuffed with money for the winners and persons on the "payroll".

■ Since none of the claimants had paid the special tax of $50.00 at the time of the raid or during the surveillance nor had registered as required by law, and Whitey's had not been registered as a place for wagering operations, the evidence made out a prima facie case that the currency and checks taken from the pockets of Sigal, Granoff and Rabinovitz were guilty instrumentalities that had been used in an illegal numbers operation, i. e., wagers, and were intended to be so used therein, i. e., in paying off the winners and in taking "care of writers' problems".[5]

■ Claimants contend that the money in their pockets was not shown to be an integral part of the gambling operation and they cite Pennsylvania authorities for its return. We are of the opinion that federal law applies, United States v. $1,508.40, 158 F.Supp. 916 (S.D. Ill.N.D.1958), and once the Government has established a prima facie case for a forfeiture, it is entitled to prevail unless countervailing evidence is offered, and none was offered in these cases. A circumstance against claimants was their failure to offer evidence which

---

3. At Whitey's the agents heard Rabinovitz called "Piggy" and "Rabinovitz" but did not know his first name was Abe. Although it may have been better to have included "Rabinovitz" in the description, the omission is not fatal to the validity of the warrant or the arrest since the description given was sufficiently particularized for accurate identification.

4. The tip sheets are not noted on the return to the search warrant.

5. Rabinovitz had paid the special tax for some previous years and the excise tax, but he had not paid the special tax for the year beginning July 1, 1961, or at any time prior to the raid.

would explain or rebut the strong inferences arising from the surveillance incriminating the money in their pockets. United States v. Roberson, 233 F.2d 517, 519 (5th Cir. 1956); Stagner v. United States, 197 F.2d 992, 994 (5th Cir. 1952); United States v. Currency in Total Amount of $2,223.40, 157 F.Supp. 300, 304 (N.D.N.Y.1957); United States v. $1,508.40, supra at p. 918. Moreover, the wagered currency, which the claimants habitually put into their pockets after the "writers" and "pick-up men" delivered it along with numbers slips, does not seem to have been withdrawn from the illegal wagering operation but was an integral part thereof. For these reasons we conclude that the money and checks are subject to forfeiture. Cf. United States v. Leveson, 262 F.2d 659 (5th Cir. 1959).

The statement made by Rabinovitz to Agent Hyatt after his arrest as to the source of the money taken from him—a statement not denied or verified by him—appears to the court to be a fabrication. Thus an additional inference arises that the money and check taken from Rabinovitz were guilty.

■ Since the agents never saw Granoff put any of the wagered money in his wallet, that money, i. e., $418.00, should be excluded from the forfeiture and returned to him. Although this is a close question because Granoff did not testify, cf. United States v. $4,298.80 in Currency, 179 F.Supp. 251 (D.C.Md.1959), we think that the libellant has failed by a preponderance of the evidence to prove that the contents of Granoff's wallet were used or intended for use in the illegal wagering operation.

Prior to the raid, Agent Taylor had given Madden an affidavit embodying many details of his surveillance of Whitey's. This affidavit (Claimants' Ex. 8) was finally drafted on November 21st, after the raid, and subscribed by both Taylor and Boone. It was not exhibited to the United States Commissioner.

On November 17, 1961, Agent Madden applied to Commissioner McNaugher for a search warrant for Whitey's; his affidavit upon which the search warrant issued is set forth in the appendix. Madden also subscribed the complaints and the accompanying affidavits upon which the Commissioner issued the arrest warrants. All the affidavits allege substantially the same facts.

■ Claimants attack the legality of the search warrant and the arrest warrants on the ground that, except for the search of the tax records, they were issued on hearsay evidence contained in the Madden affidavits. They contend that Madden did not accurately set forth his belief in the reliability of his informants.

The contents disclose that three informants believed by Madden to be reliable told him substantially the same facts, which indicated that Whitey's was a place at which illegal wagering paraphernalia was concealed and that claimants Sigal, Granoff, and Piggy (Rabinovitz) were persons engaged in the business of accepting wagers. The informants' stories corroborated each other, and since two of them were criminal investigators of long experience, Madden had reasonable grounds to swear they were reliable. The objections of claimants that one informant was erroneously characterized as "confidential" in the affidavits, and that the others had not given him accurate information in the past, are without merit.

Also, in our opinion, there was substantial basis for crediting the hearsay statements contained in the Madden affidavits presented to the Commissioner to establish probable cause that gambling paraphernalia was concealed at Whitey's and that Sigal, Granoff, and Piggy (Rabinovitz) were illegally engaged in the business of accepting wagers. Cf. Jones v. United States, 362 U.S. 257, 267–272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In United States v. Bianco, 189 F.2d 716 (3d Cir. 1951), it was held that hearsay evidence, received from "reliable" unnamed informants and a surveillant

agent could establish probable cause to arrest for felony without a warrant.

We conclude that the Commissioner in the instant cases was justified in issuing the search warrant and arrest warrants upon Madden's affidavits presenting, inter alia, adequate hearsay evidence received from reliable informants, showing probable cause.

■ The arrest warrants were directed "to any U. S. Marshal or other authorized officer". Claimants contend that Madden as a special agent in the Intelligence Division of the Internal Revenue Service was not an "authorized officer" and had no power to execute the arrest warrants. We disagree. The authority of Internal Revenue officers to make arrests, and, incidentally thereto, to search and seize contraband found on the person, is traced and upheld in United States v. Jones, 204 F.2d 745 (7th Cir. 1953), cert. denied 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368, rehearing denied 346 U.S. 905, 74 S.Ct. 216, 98 L.Ed. 404.

It is true that some of the sections of the 1939 I.R.C. cited in that case were omitted in the I.R.C. of 1954, but the omissions did not disclose any repeal by implication of the power of revenue agents to execute arrest warrants. Cf. United States v. Joseph, 174 F.Supp. 539, 545 (E.D.Pa.1959), aff'd 278 F.2d 504 (3d Cir. 1960). Under the I.R.C. of 1954, Congress vested in the Secretary of the Treasury broad supervisory, executive and legislative powers to enforce the provisions of the internal revenue laws. Title 26 U.S.C.A. § 7801 et seq. In § 7803(a) Congress authorized the Secretary to employ persons for the purposes of administering and enforcing the internal revenue laws. Agent Madden, a special agent in the Intelligence Division of the Internal Revenue Service, was employed to enforce the internal revenue laws, and, as was said in United States v. Jones, supra, 204 F.2d at p. 753, the power to enforce the law carries with it "the

incidental power to arrest one found to be violating the law". In Leahy v. United States, 272 F.2d 487 (9th Cir. 1959), the execution of a warrant of arrest by a revenue agent and the search incident thereto was held to be valid. If the cases cited by claimants [6] hold to the contrary, they are not persuasive; in none of them was reference made to United States v. Jones, supra, 204 F.2d 745.

■ There can be no doubt that revenue agents have authority to execute search warrants. United States v. Joseph, supra, a case in this Circuit; United States v. Clancy, 276 F.2d 617 (7th Cir. 1960), rev'd on other grounds 365 U. S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574; United States v. Gannon, 201 F.Supp. 68, 71 (D.C.Mass.1961). It is to be observed that the search warrant was specifically directed "to any duly authorized agent of the Internal Revenue Service". It seems that under § 3105, Title 18 U.S. C., Agent Madden had statutory power to execute it. See also, Rule 41(c), Fed. R.Crim.P.

■ Finally, claimants contend that the articles seized on the premises pursuant to the search warrant, and the currency and checks taken from the persons pursuant to the arrest warrants, were merely evidentiary matter and constitutionally protected from seizure. However, it is well settled that numbers slips, tip sheets, tapes, and money are gambling paraphernalia and as such are instrumentalities used in the commission of the crime of unlawfully engaging in the business of wagering. Hence, they may be lawfully seized and used as evidence in a criminal prosecution. United States v. Joseph, supra, 174 F.Supp. at p. 544; United States v. Clancy, supra, 276 F.2d at pp. 629–631. Cf. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). As stated in

6. United States v. Interbartolo, 192 F. Supp. 587 (D.C.Mass.1961); United States v. Festa, 192 F.Supp. 160 (D.C. Mass.1960); United States v. Gannon, 201 F.Supp. 68 (D.C.Mass.1961).

## 52

Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925):

"When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."

■ The court has jurisdiction since the money and checks were in the possession of the revenue agents when the libels were filed. Dodge v. United States, 272 U.S. 530, 532, 47 S.Ct. 191, 71 L.Ed. 392 (1926). We conclude that the arrests of Sigal, Granoff and Rabinovitz pursuant to the arrest warrants were legal; that the search of their persons incident to the arrests was legal; that the currency and checks found in their pockets are contraband and should be forfeited to the United States; that the search of the premises known as Whitey's pursuant to the search warrant was legal; that the gambling paraphernalia seized in the premises, including the currency and checks found in the pockets of Sigal, Granoff, and Rabinovitz, were instrumentalities used in the commission of the crime of unlawfully engaging in the business of wagering; and that the motions to suppress evidence should be denied.

Appropriate orders will be entered.

### APPENDIX

"UNITED STATES OF
 AMERICA ss:
WESTERN DISTRICT OF
 PENNSYLVANIA

"Robert J. Madden, Special Agent, Internal Revenue Service, 1005 Chamber of Commerce Building, Pittsburgh, Pennsylvania, being duly sworn according to law, deposes and says:

"I have been a Special Agent with the Internal Revenue Service since August, 1945.

"I have reason to believe that on the premises known as 1618 Centre Avenue, Pittsburgh, Pennsylvania, being further described as Whitey's Restaurant and Poolroom, there is now being concealed certain property, namely bookmaking records, wagering paraphernalia consisting of bet slips, run-down sheets, account sheets, record books, numbers tapes, adding machines and money used in or derived from a bookmaking operation, which are being used in violation of Sections 4411, 4412 and 7203 of the Internal Revenue Code of 1954.

"The facts tending to establish the foregoing grounds for issuance of a search warrant are as follows:

"A confidential informant, who has furnished reliable information in the past, informed me that Meyer Sigal is the head of a large numbers operation in the Hill District of the City of Pittsburgh, Pennsylvania, and that Nathan Granoff and a white male, called 'Piggy,' 5' 7" tall, dark complected, weighing 125 to 140 lbs. with dark hair, assist Sigal in the conduct of this numbers operation. He told me that David Berkowitz and Sam Parrotto are two of his lieutenants in the operation. He informed me that numbers packs are turned in at the aforesaid Whitey's Restaurant and Poolroom, 1618 Centre Avenue, Pittsburgh, Pennsylvania, both in the front section and the back, poolroom section, between the hours of 2:00 and 3:00 p. m. and that a pick-up man takes the numbers each afternoon to a headquarters for tabulation. The informant also told me that he observed Meyer Sigal meet with his principal writers each morning at the aforesaid Whitey's Restaurant and Pool Room between 8:30 and 10:30 a. m. and makes cash settlements and pays off on hits.

"Two additional informants, who at this time must remain unidentified, but who are known to me to have furnished reliable information in the past, reported to me that on Sep-

·tember 11, 1961, Sigal was observed accepting numbers packs from known numbers operators, in the poolroom section of the aforesaid Whitey's Restaurant and Pool Room and that Nathan Granoff assisted him.

"On November 9, 1961, these same two informants reported to me that during the period of October 16 through 30 and November 6 through ·9, 1961, Meyer Sigal was observed each morning working on adding machine tapes with Granoff and 'Piggy' and stuffing money in bank type envelopes. These envelopes were usually stored near the telephone and sometimes put into the cash register or behind the counter. On November 7 and 8, 1961, Sam Parrotto was observed giving Sigal .a large pack of money. They also reported that during the period October 16 to 21, 1961, and November ·6 to 9, 1961, they observed numbers packs being turned in at Whitey's Restaurant and Pool Room between 2:00 and 3:00 p. m., to 'Piggy.'

"These same two informants report-·ed to me that they were present in .aforesaid Whitey's Restaurant and 'Pool Room on September 28, 1961, at 10:30 a. m. when Meyer Sigal held a meeting with certain individuals, including Sam Parrotto, David Berkowitz, Nathan Granoff and 'Piggy.' The informants overheard a discussion between the persons present as to whether Meyer Sigal should meet with the Fifth Avenue Group, another numbers organization, which reportedly raised their payoff odds to 800 to 1. According to the discussion overheard, Sigal's Bank had raised their payoff odds from 600 to 1 to 700 to 1 and the commission of the numbers writers was cut to 15%. Sam Parrotto and

David Berkowitz spoke frequently in the meeting against changing the payoff odds. Sigal took the position that he had a $600 payroll to take care of the writers problems. The informants overheard Sigal finally agree to meet with the Fifth Avenue Group, and after making several telephone calls he left Whitey's with Granoff at 1:30 p. m.

"On October 19, 1961, at the aforesaid Whitey's Restaurant and Pool Room, these same informants overheard a Negro male individual asking Sigal's permission to open a numbers station. Sigal told him he would have to confine his activities to the area around Whitey's old place. On November 9, 1961, Granoff was observed going into the basement at Whitey's Restaurant and Poolroom for supplies.

"On November 15, 1961, I personally searched the records of the District Director, Pittsburgh, Pennsylvania, for all wagering tax stamps issued in the Pittsburgh District for the period July 1, 1961 to November 16, 1961. I found no record of the registration or issuance of a wagering occupational tax stamp to Meyer Sigal, Nathan Granoff, David Berkowitz or Sam Parrotto. My search of the District Director's records also disclosed that the premises known as Whitey's Restaurnat [sic] and Pool Room, 1618 Centre Avenue, Pittsburgh, Pennsylvania, was not registered as a business or residence address of a wagering tax stamp holder.

"Robert J. Madden
Robert J. Madden
Special Agent

"Sworn to before me, and subscribed in my presence, November 17, 1961.

"Alex L. McNaugher
United States Commissioner"