**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Peter BALISTRIERI, Defendant-**
**Appellant.**

**No. 16639.**

United States Court of Appeals
Seventh Circuit.

Nov. 7, 1968.

Rehearing Denied Dec. 31, 1968.

Maurice J. Walsh, Carl M. Walsh, Chicago, Ill., for defendant-appellant; Dominic Frinzi, Milwaukee, Wis., of counsel.

James B. Brennan, U. S. Atty., Milwaukee, Wis., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Chief, Appellate Section, Richard B. Buhrman, Charles A. McNelis, Joseph M. Howard, Attys., Tax Division, Dept. of Justice, for plaintiff-appellee.

Before CASTLE, Chief Judge, KNOCH, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

CASTLE, Chief Judge.

Defendant appeals from his conviction on Counts II and III of a three-count indictment charging him with crimes against the revenue. Count I charged defendant and Jennie Alioto with conspiring to defraud the Government by impeding the lawful functions of the Internal Revenue Service in the assessment and collection of income taxes. Counts II and III charged defendant with income tax evasion for the years 1959 and 1960 by filing false and fraudulent tax returns, in violation of 26 U.S.C. § 7201.

Defendant and Miss Alioto, as co-defendants, filed motions for relief from prejudicial joinder, to dismiss Count I of the indictment, for a Bill of Particulars on Counts II and III, and to suppress certain evidence, copies thereof, leads derived therefrom, and information secured thereby resulting from a search and seizure of Miss Alioto's apartment, conducted under an illegal search warrant.[1] After the Government filed a Bill of Particulars, defendant's motion for a further Bill of Particulars was denied. The trial was then transferred from the Eastern District of Wisconsin to the Southern District of Illinois, Southern Division, for trial as to Balistrieri only. An amended Bill of Particulars was filed shortly after the trial began, reducing the alleged beginning and end net worth figures, and thus the increases in the net worth of defendant and his wife during the relevant period by over 50%.

The Government's case was presented on the "net worth theory" whereby income for the relevant period is proved by showing that the defendant's net worth increased during the period. Thus, rather than having to prove the exact source or sources of the income, the defendant may be convicted of income tax evasion upon a showing that his net worth was unaccountably higher at the end than at the beginning of the tax period, and that the increase was not due to non-taxable sources, such as gifts, loans, or inheritance. In the instant case, the Government sought to bolster its net worth evidence with evidence of the likely sources of income.

Shortly before trial, defendant moved to suppress evidence obtained by electronic eavesdropping of defendant's office, after defendant had discovered a hidden microphone installed behind his office paneling. On the date when the trial was scheduled to begin, the Government attorneys disclosed to the trial judge that the Government had three categories of F.B.I. reports obtained by admittedly illegal electronic eavesdropping. These reports concerned conversations overheard from devices placed in Miss Alioto's apartment from October 3, 1961 through June 8, 1962, in defendant's office from March 9, 1964 through June 3, 1965, and in the office of Dominic Frinzi, one of defendant's attorneys, from April 22, 1963 through October 2, 1963.

A substantial amount of testimony on this matter was heard by the court outside the presence of the jury. Defendant moved to dismiss the indictment on the ground that it was obtained through use of the information acquired by means

---

1. The search warrant obtained by the Internal Revenue Service was quashed in an action brought by Miss Alioto and the owners of the materials seized in the search. Alioto, et al. v. United States, 216 F.Supp. 48 (E.D.Wis.1963). It also appears that the F.B.I., subsequent to the above search, unlawfully searched Miss Alioto's apartment and photographed certain documents belonging to defendant which were kept therein.

of the illegal electronic eavesdropping, and this motion was denied. The court also denied motions for acquittal and motions that the eavesdropping information was inflammatory and deprived defendant of a fair grand jury. The court did, however, compel election by the Government to proceed on Counts II and III, and not on Count I, apparently in recognition of tainted evidence used in the first count.

Upon a verdict of guilty on Counts II and III, defendant was sentenced to two years imprisonment and fined $5000 on each count, the prison terms to run concurrently.

On appeal, defendant attacks the adequacy of the Government's evidence in meeting its burden of proving that the trial evidence was free from taint, the sufficiency of the evidence used to prove the "net worth theory" of tax evasion, the trial court's denial of defendant's motion for mistrial based upon the prosecutor's improper cross-examination of a witness, the trial court's refusal to answer the request of the jury for clarification of instructions, alleged improper arguments to the jury by the prosecutor, and an alleged breach of the attorney-client and accountant-client privilege.

## I

The main contested issue concerns the Government's proof that its evidence was free from taint of the illegal searches and seizures and electronic eavesdropping.

During 1961, in the initial stages of the Internal Revenue Service investigation of defendant, the I.R.S. had, through the Postal Inspector in Milwaukee, requested that "mail covers" [2] be conducted on defendant's address and on various corporations which the I.R.S. believed were conneccted with defendant. Among these were the Downtowner (a tavern) and Gallagher's Steak House (a restaurant). On July 7, 1961, the I.R.S. received a mail cover report which disclosed that a first class letter addressed to Midwest Scrap Metal Company at the address of the Downtowner was delivered. The return address—Post Office Box 1205—was later determined to be the First Wisconsin National Bank of Milwaukee. On August 7, 1961, another mail cover report showed that a letter from Altex Corporation, a scrap metal dealer, was sent to Gallagher's Steak House. Lead cards were made and filed for each of these leads.

■ Contrary to the findings made by the district court at the close of the testimony regarding the alleged tainted evidence, defendant contends that the evidence relating to Midwest Scrap Metal Company, upon which the Government relied as establishing a source of unreported income, was discovered only as the result of information extracted from the records illegally seized in Miss Alioto's apartment and as the result of the subsequent search by the F.B.I., and not by the independent leads obtained by the exploitation of the information extracted from the mail covers and lead cards by the I.R.S. On all issues regarding the alleged tainted evidence, the Government conceded that it had the burden of proving that its evidence was free from taint.[3]

With respect to the Midwest Scrap Metal Company evidence, the Government sought to meet this burden by demonstrating that the lead was discovered independently of and prior to the searches, as the result of the mail covers conducted in the summer of 1961. In fol-

2. A "mail cover" is conducted by furnishing the Government with the information appearing on the face of the envelope addressed to the particular address: i. e., addressee, postmark, name and address of sender (if it appears), and class of mail. The actual mail is delivered to the addressee and only the letter-carrier's notation reaches the Government agency which requests the mail cover.

3. See United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ; Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) ; United States v. Coplon, 185 F.2d 629, 636 (2d Cir. 1950), cert. den. 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688.

lowing up the mail cover leads, the Government contends that it was led to the Altex Corporation. From the records of Altex followed other leads and evidence regarding Midwest and its connection with defendant. We find that the district court did not err in holding that the Midwest leads were obtained independently of the searches. The two lead cards disclosed that the address of Midwest, a dealer in scrap metal, was the same as the address of a business in which defendant was known to have an interest (the Downtowner), and that Altex, a seller of scrap metal, sent a letter to another business in which defendant had an interest (Gallagher's). It is reasonable to conclude that these two leads were logically tied together by the revenue agents, before the searches took place, to link Altex with Midwest and thus provide an important step in the investigation. Therefore, although the evidence obtained in the illegal searches would have led to the same link between Altex and Midwest which in turn led to the other evidence, some of which was admitted into evidence at trial, the initial lead was obtained independently of and prior to the search.

In Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920), Mr. Justice Holmes, speaking for the Court, stated the policy behind the Fourth Amendment:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it * * *." 251 U.S. at 392, 40 S.Ct. at 183.

In Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), the Supreme Court cogently held:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)."

■ We hold that the evidence relating to Midwest was not "come at by exploitation" of the information obtained in the illegal searches and seizures, but "by means sufficiently distinguishable to be purged of the primary taint."

We reach the same conclusion regarding the evidence allegedly obtained by the illegal electronic eavesdropping. The Government met its burden in proving that its evidence was free from this taint by disclosing to the court and the defendant all information in the Government's possession, including summaries of the tapes which had been erased in the ordinary course of re-use,[4] undestroyed tapes, and by making available the agents who participated in the eavesdropping. The district court ordered suppressed all the information obtained as the result of the electronic surveillances and the searches and seizures and all leads developed therefrom. Defendant contends, however, that the Government failed to meet its burden since it had destroyed the best evidence of what had been heard through erasure of the recordings on some of the tapes by their re-use. However, the Government tendered proof to the district

4. The recent Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518, which requires all recordings made pursuant to it to be kept for ten years, has no application to the instant case in which the investigation took place prior to its passage.

court showing independent sources for the leads to each of the items of evidence introduced at trial. The trial judge displayed a high degree of prudence and deliberation in hearing extensive testimony from each side before concluding that the evidence offered by the Government was free from taint. We agree with his conclusion.

Mr. Justice Frankfurter, speaking for the Supreme Court in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), stated the guidelines to be used by federal courts in determining issues of tainted evidence. After stating the quotation from *Silverthorne*, cited above by us, he said:

> "In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." 308 U.S. at 341, 60 S.Ct. at 268.

Therefore, although some causal connection could, by sophisticated argument, be shown between the electronic eavesdropping and the Government's proof, we find that "such connection has become so attenuated" in the instant case as to dissipate the taint. The trial judge gave defendant the opportunity to show that a substantial portion of the case against him was the fruit of the poisonous tree, and we conclude that the decision of the district court that the Government met its burden of proving its evidence free from taint is supported by substantial evidence and not erroneous.

Judge Learned Hand's comment in United States v. Nardone, 2 Cir., 127 F.2d 521, 523 (1942), cert. den. 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 is particularly appropriate to the issues discussed above:

> "The question therefore comes down to this: whether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped. We do not believe that the Supreme Court meant to involve the prosecution of crime in such a tenebrous and uncertain inquiry, or to make such a fetich of the statute [47 U.S.C. § 605] as so extreme an application of it would demand. On the last appeal the court made it abundantly clear that it did not contemplate a chase after will-o'-the-wisps. 'Tenuous claims' are not 'sufficient to justify the trial court's indulgence of inquiry into the legitimacy of evidence.' The 'claims * * * must satisfy the trial court with their solidity.' We are not 'to subordinate the need for rigorous administration of justice to undue solicitude for potential and, it is to be hoped, abnormal disobedience of the law.' [308 U.S. 338, 60 S.Ct. 268, 84 L.Ed. 307.] Such expressions indicate no disposition towards the refinements inevitable in deciding how far the illicit information may have encouraged and sustained the pursuit. We hold that, having proved to the satisfaction of the trial judge that the [electronic surveillance and searches and seizures] did not, directly or indirectly, lead to the discovery of any of the evidence used upon the trial, * * *, the prosecution had purged itself of its unlawful conduct."

■ Defendant's contention that the eavesdropping evidence used to obtain Count I of the indictment was prejudicial as to him affords no basis for reversal since he was never prosecuted on the first count. An illegal search and seizure "does not serve to immunize" the defendant from prosecution. United States v. Ruffin, 389 F.2d 76, 79 (7th Cir. 1968); United States v. Hoffman, 385 F.2d 501, 503–504 (7th Cir. 1967).

■ Defendant further contends that the eavesdropping conducted on the law office of Mr. Frinzi constituted an intentional interference by the Government with defendant's Sixth Amendment right

to counsel. As with the other electronic eavesdropping, the Government proved its evidence was free from any taint as the result of this illegal surveillance. Defendant's Sixth Amendment claim is no more than speculation. We find nothing in the record supporting the allegation that the purpose of conducting the surveillance was to interfere with defendant's right to counsel, nor does it appear that such right was infringed as the result of the Government's conduct.

Defendant also contends that the overhearing of his telephone conversation with Mr. Walsh, who represented the defendant both below and on appeal, was a purposeful denial of his right to counsel. Again, there appears in the record no indication that the Government obtained any evidence from the overhearing of this call, or that it interfered with defendant's right to counsel.

Defendant relies heavily on O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), in his Sixth Amendment claims. That case is quite distinguishable, however, in that, unlike the instant case, the eavesdropping was not disclosed until after the defendant's conviction. It was this fact which required reversal, since the *undisclosed* intrusion on the attorney-client relationship deprived defendant of his right to an adversary proceeding.

Defendant argues that, even though we hold that the above violations were sufficiently divorced from the evidence presented at trial to free them of taint, we should reverse in the exercise of our supervisory power "because the indictment was procured by use of inflammatory and grossly illegal evidence." The argument is based on the allegation that so many violations occurred in the investigation that the only remedy is reversal. Such is not the law.

The decisions of the Supreme Court have consistently held that the remedy for illegally obtained evidence is suppression of such evidence and all leads derived therefrom.[5] This remedy was fully accorded to defendant by the district court, and we find no authority for the proposition that the defendant is further entitled to reversal, after the illegally obtained evidence was suppressed and the jury returned a verdict of conviction upon the other evidence which had been properly admitted.

II

The next general contention by defendant is that the evidence used to prove the net worth theory of tax evasion was legally insufficient, and therefore that his motions for acquittal at the close of the Government's case and at the close of all the evidence should have been granted. Defendant cites Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), as the leading case on the "net worth method." That case held that this method of proving income tax deficiency "is so fraught with danger for the innocent, that the courts must closely scrutinize its use." 348 U.S. at 125, 75 S.Ct. at 130. The Court went on to say:

"While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. Cf. Universal Camera Corp. v. [National] Labor [Relations] Board, 340 U.S. 474, 489 [71 S.Ct. 456, 465, 95 L.Ed. 456]. Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the

---

5. E. g., Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed. 2d 1178 (1967); Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920).

defendant to refute. Charges should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused. Appellate courts should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." 348 U.S. at 129, 75 S. Ct. at 132. Cf. United States v. Tolbert, 367 F.2d 778 (7th Cir. 1966).

With these words of the Supreme Court fully in mind, we nevertheless find no error below which would justify reversal. In dealing with this general contention, we find that careful scrutiny leads us to the conclusion that the Government established a *prima facie* case against defendant, and that defendant's five-pronged attack on the Government's case is without merit.

■ (1) Defendant first contends that the Government failed to show a solid net worth starting point. However, the starting point in defendant's net worth, as used by the Government and placed before the jury for its decision, was based upon a net worth statement which was signed by defendant and his wife and submitted to the Wisconsin Department of Taxation in 1954. This statement included cash on hand as of December 31, 1953, in the amount of $1000. The propriety of including this figure in the net worth starting point was upheld by this Court in United States v. Mackey, 345 F.2d 499, 506 (7th Cir. 1965), cert. den. 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed.2d 69 where the Government's case did not have the advantage of a signed statement concerning the defendant's cash on hand.

Added to the amount claimed by the statement were certain visible assets belonging to defendant which had been dis-

closed by the Government's investigation, and which were not included in the statement.[6] After arriving at a net worth of $73,780.62 as of December 31, 1953, the Government traced defendant's net worth at the end of each year, through the prosecution years of 1959 and 1960, proving that defendant's reported income could not account for any increases in cash on hand significantly larger than the $1000 for which he was given credit. Certain accrued liabilities were properly eliminated in the Government's computations since defendant reported income on the cash basis. Thus, as the Government points out in its brief (at p. 33), "the gap between the starting point and the beginning of the first prosecution year, 1959, was bridged by carefully reconstructing appellant's net worth as of the end of each intervening year, adding nondeductible expenditures, and demonstrating that no additional cash on hand could have been accumulated from income reported in the intervening years."

(2) Defendant further argues that the Government failed to account for borrowings in arriving at its net worth figures. After carefully scrutinizing the record, however, we find that the loans were taken into account as liabilities and that defendant was given proper credit for them.

■ (3) Defendant also attacks the propriety of including in his net worth as of December 31, 1959, $10,000 of cash on hand which had been deposited in the Marshall and Ilsley Bank in the name of Joseph Balistrieri or Frank Balistrieri, the defendant, on January 25, 1960. Joseph is defendant's son, who was a 19 year old minor and was claimed as a dependent by defendant, at the time the joint account was opened. The jury had ample grounds to believe that this money was in fact the defendant's since the Government proved that defendant controlled the account and withdrew a substantial amount from it on March 23, 1961. We

6. The largest item in this category included the stock of Tower Tavern, Inc., amounting to $31,062.67, which defendant claimed was bought in large part through a loan from his mother.

therefore find that the evidence was sufficient to support such a conclusion.

■ (4) As a final attack on the denial of the motion for acquittal at the close of the Government's evidence, defendant contends that the prosecution failed to prove that the increases in net worth arose from taxable sources. However, the Government fulfilled its burden under the net worth method by: (a) giving defendant credit for all loans and for the proceeds of a life insurance policy received in 1958; (b) proving that the increases did not arise from gifts or inheritance; and proving three "likely" sources of taxable income—Hotel Roosevelt, Inc., Ben-Kay, Inc.,[7] and Midwest Scrap Metal Company. In Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954), the Court held that "[i]ncreases in net worth, standing alone, cannot be assumed to be attributable to current taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient." Cf. United States v. Mackey, 345 F.2d 499, 507 (7th Cir. 1965). The record, therefore, clearly indicates that the evidence presented to the jury was sufficient to support its verdict.

■ (5) Defendant contends that the evidence produced by the defense conclusively rebutted the Government's case and required the granting of the motion for acquittal at the close of all the evidence. However, defendant's evidence consisted of testimony which the jury was justified in disbelieving as the result of their view of the demeanor of the witnesses and the cross-examination. Surely we can neither place ourselves in the unique position of the jury nor can we hold that they were compelled to believe the testimony of the defense witnesses they viewed, especially when much of the testimony conflicted with the evidence properly introduced by the Government.

■ For the foregoing reasons, we hold that both motions for acquittal were properly denied.

### III

■ Defendant contends that the trial court's denial of his motion for mistrial based upon the prosecutor's improper cross-examination of defense witness Klein constitutes reversible error. The Government agrees that the two questions complained of constituted improper cross-examination, but contends that it was not prejudicial. Our review of the facts present in the instant case leads us to the same conclusion, that the error here was not prejudicial and does not call for reversal. First, the objections made by defense counsel were sustained and the jury was explicitly instructed to disregard the questions.

■ Moreover, the fact that witness Klein's testimony concerned only one of the indictment years and involved only a relatively small amount further demonstrates the lack of prejudicial effect of the improper cross-examination. It does not follow, as contended by the defendant, that improper impeachment of the first defense witness destroys the testimony of later witnesses called by the defense. To so hold, in view of the trial court's sustaining defendant's objections and the immediate instruction to disregard the improper questions, would involve an unwarranted assumption denying to the jury any degree of intelligence or discretion. Consequently, we do not view the denial of the motions for mistrial as erroneous.

### IV

■ Defendant contends that the trial court committed error in overruling his objection and denying his motion for mistrial, based on the prosecutor's statement, in his summation to the jury, that there were possible sources of income other than Midwest Scrap Metal Company, and is naming a number of such possible sources with which defendant

---

7. There was evidence that defendant operated and served as president of these two companies.

was connected. Defendant seems to ignore the fact that this statement by the prosecutor was made in reply to defense counsel's statement in his summation that Midwest was the only proven source and that that source was not nearly large enough to account for the unreported income shown by the Government's proof. Moreover, in a net worth case the Government need not prove a specific source of income to account for the increases in net worth, but need only show some "likely" source. Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Armstrong v. United States, 327 F.2d 189, 194 (9th Cir. 1964); United States v. Mackey, 345 F.2d 499, 506–507 (7th Cir. 1965). Defendant's connection with the companies mentioned having been shown, the prosecution was allowed to argue the possibility of these companies as a possible source of income.

## V

 Defendant further contends that the trial court committed error when it sent the jury back for further deliberations after the jury expressed some confusion regarding the instructions. We hold that no error was committed. When the jurors failed to make clear their problem, the trial judge advised them that if they had a problem they could submit it to the court in writing. Neither counsel objected, and defense counsel initiated the suggestion regarding the written inquiry. The jury then retired and later returned a verdict of guilty. To hold that these events compel reversal in this case would be entertaining the vaguest of speculations as to what was in the minds of the jurors. Rather than engage in such speculation himself, the judge refused to put words into the jurors' mouths and instead, upon suggestion of defense counsel, asked them to submit any problems they had in writing. Such conduct was correct and does not constitute error.

## VI

 Defendant's last contention posits a violation of the attorney-client and accountant-client privilege in the tri-

al court's allowing defendant's accountant to testify for the Government over defendant's objection. This contention is without merit for three reasons: (a) the accountant was not an attorney at law and thus no attorney-client privilege is involved; (b) the Illinois statute creating an accountant-client privilege—Chap. 110½, § 51, Ill.Rev.Stat.—may be invoked only by the accountant, not the client. Dorfman v. Rombs, 218 F.Supp. 905, 907 (N.D.Ill.1963); and (c) in a federal criminal tax prosecution, federal law applies, Colton v. United States, 306 F.2d 633, 636 (2d Cir. 1962), cert. den. 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499, and there is no accountant-client privilege in the federal system. Petition of Borden Co., 75 F.Supp. 857, 859–860 (N.D.Ill.1948); United States v. Culver, 224 F.Supp. 419, 434 (D.Md.1963) and cases cited. Palmer v. Fisher, 228 F.2d 603 (7th Cir. 1955), cited by defendant, was a diversity case in which the Government was not a party, and is therefore inapplicable.

For the foregoing reasons, the judgment of conviction is affirmed.

Affirmed.