**UNITED STATES of America**

v.

**Roger S. BASKES.**

**No. 76 CR 585.**

United States District Court,
N. D. Illinois, E. D.

Dec. 2, 1977.

---

See also: D.C., 433 F.Supp. 799, D.C., 433 F.Supp. 812.

Sam L. Strother and Joseph W. Salus, II, Dept. of Justice, Washington, D. C., for government.

Harvey M. Silets, Harris, Burman & Silets, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

Pursuant to the directions contained in this court's earlier opinion of May 18, 1977 (433 F.Supp. 799, 808–09), a post-trial hearing has now been held for the purpose of determining:

(1) Whether, as alleged by defendant Baskes, the indictment in this case and much of the Government's evidence stemmed directly from the Briefcase Incident; and

(2) Whether the Government's misconduct in the Briefcase Incident, if shown, would warrant the invocation of the supervisory powers of this court to suppress any or all of the evidence at the trial and/or to set aside the verdict of guilty as to the defendant Baskes.

This opinion will supplement the oral statement made by the court prior to sentencing and will deal in detail with the evidence produced at such hearing followed by a restatement of the court's conclusions.

An appraisal of the evidence at the suppression hearing cannot be made except in the context of the indictment and of certain crucial evidence introduced at trial.

### The Indictment

The indictment charged the defendant with a conspiracy to defraud the United States out of income and gift taxes in violation of 18 U.S.C. § 371. The means alleged included the structuring of the sale of Arlington Towers and Arlington Plaza, real estate located in Reno, Nevada, in such a manner as to conceal and falsify the true value of the property and to disguise the true tax consequences of the transaction.

In particular, it was charged that the defendant and his associates[1] falsely attributed the value of $700,000 away from the Reno properties and onto the transfer of a near-worthless mining claim known as Hornet No. 2.

In addition, it was charged that the defendant and his associates "carried out a series of manipulations through the use of a corporate entity, corporate stock, foreign and domestic trusts, partnerships, backdated documents, and ostensible transfers of ownership, so as to disguise and conceal

[1]. In addition to Roger Baskes, the indictment names two other attorneys in the law firm of Levenfeld, Kanter, Baskes and Lippitz, Burton W. Kanter and Alan H. Hammerman, and another attorney admitted to practice in Illinois,

from the Internal Revenue Service the true nature of the sale of Arlington Towers and Arlington Plaza."

### The Trial Evidence

An abandoned gold mine located near Tonopah, Nevada, having little or no actual value, became the central issue in this case.

Under the scheme which was structured by the defendant Baskes for the purpose of overcoming the capital gain tax consequences of the Cavanaugh sale, $700,000 of the purchase price was lifted from the transaction and was allocated to the Hornet No. 2 mining claim. None of the papers that were executed in connection with the sale of the property reflected this transaction. This $700,000 found its way to an account known only as Settlement T–5088, which was a trust administered by the Castle Bank as trustee for two of the Cavanaugh children as beneficiaries, and by disguising this part of the transaction, the payment of gift taxes was avoided.

In addition, the trial evidence disclosed a further motive for the defendant Baskes to arrange to have the practically worthless mining claim included in the transaction. Through his association with Zell, the buyer, and his influence in the sale transaction, the defendant was able to arrange the transaction in such a way that the mining claim would later be available for use as a device for obtaining a substantial tax deduction for one of his other clients, Fantasy-Galaxy, Inc.

This was achieved in the following manner: First, John Cavanaugh transferred the mining claim to a corporation, Jeffrey Investment Corporation, in exchange for stock. Jeffrey Investment Corporation then transferred the claim to the Castle Bank and Trust Company Trust T–5088. The buyer, Zell, then deposited the $700,000 in T–5088, and the mining claim was transferred to Zeno N.V., a Netherlands Antilles

Samuel Zell. The indictment was dismissed as to Hammerman and Zell in exchange for their testimony. The jury returned a verdict of acquittal as to Kanter.

corporation affiliated with the Castle Bank. Zeno N.V. then gave the claim to a newly formed corporation, Hornet Mining, Inc., in exchange for its stock. Almost immediately, the Hornet Mining stock was sold to a partnership called Tonopah Vein, which consisted of Fantasy-Galaxy with 99% stock interest and Buckeye Oil Co. with 1%. The defendant Baskes was trustee and partner in Buckeye Oil, and his firm was tax counsel to Fantasy-Galaxy. The sales agreement from Zeno to Tonopah Vein set the price of the worthless mining claim at $900,000, as opposed to the $700,000 valuation used in the Cavanaugh transaction. The evidence revealed that Zeno actually received about $36,000, and that Fantasy-Galaxy claimed a partnership loss on account of prepaid interest in the amount of $153,000. Finally, on June 30, 1970, only months after the first transfer to the Jeffrey Investment Corp., Fantasy-Galaxy was dissolved and all of its assets, including the mining claim, went, without any apparent consideration, to Argosy Venture, a Bahamian partnership associated with the Castle Bank.

The principal evidence offered to prove the charges against the defendant Baskes was the detailed testimony of William Thornton, an attorney who was married to the daughter of John Cavanaugh and served as counsel for the Cavanaugh family. In addition, two of the co-defendants, Samuel Zell and Alan Hammerman, were severed from the trial and gave testimony for the Government as to the negotiations leading up to and the structuring of the Cavanaugh sale. This testimony was given pursuant to an agreement by the Government to dismiss the indictment as to these two defendants following the giving of truthful testimony, which agreement has now been carried out.

### The Fantasy-Galaxy Investigation

Prior to the Briefcase Incident, the IRS was generally aware that the Castle Bank was involved in certain suspicious transactions, and in October of 1972, Special Agent David Ellison was ordered to set up an investigation of the Bank to determine if it in fact was doing business in the United States and whether it was in violation of any laws.

The IRS at that time was already interested in investigating the Castle Bank because there was some evidence that it was involved in receiving funds from an alleged narcotics dealer, Alan Palmer, who was also a client of the Baskes firm. During this same pre-briefcase period, Fantasy-Galaxy, another client of the defendant Baskes, was being scrutinized by the IRS for possible tax violations connected with off-shore transactions. The name of the defendant Baskes had already surfaced in a memo dated January 10, 1973 (five days before the Briefcase Affair), which memo named Baskes as a main figure in the investment of monies through the Castle Bank and Trust Company.

In December, 1971, or January, 1972, the IRS was conducting an audit of the June 30, 1970, tax return of Fantasy-Galaxy, which had not been filed due to extensions until February 13, 1971. The return contained several questionable items, including large deductions for partnership losses through prepaid interest by Tonopah Vein, for cattle feed operations and for certain drilling ventures. One of the alleged assets of Tonopah Vein was the same abandoned gold mine, Hornet No. 2, which was the device used to evade taxes in connection with the Cavanaugh transaction.

In March, 1972, Revenue Agent Edward Nishimoto of the San Francisco district was assigned to the Fantasy-Galaxy audit. The initial documents obtained from a San Francisco partner of the defendant revealed that Argosy Venture, a Nassau corporation, had purchased all of the assets upon dissolution of Fantasy-Galaxy.

Upon obtaining the information about Argosy Venture, Nishimoto referred the case to the international group of the San Francisco district in June of 1972. Meanwhile, Nishimoto had written to the Buckeye Oil Co., as a partner in the Tonopah Vein, requesting a copy of the purchase agreement whereby the partnership had ac-

quired the mining property which was the subject of Fantasy-Galaxy's $153,000 write-off. The defendant Baskes, responding as trustee and partner of Buckeye Oil, sent a copy of the purchase agreement which disclosed that the stock in Hornet Mining, Inc., had been purchased from Zeno N.V. for $900,000.

Several international specialists were successively assigned to the Fantasy-Galaxy audit, and at some point, Nishimoto agreed that the international group would handle the mining claim part of the case. In early 1973 international agent Jim Silva was given the case.

It was at this juncture that the Briefcase Incident took place.

### The Briefcase Affair

This same Briefcase Affair was involved in an evidentiary hearing in connection with a trial before Judge Manos in *United States v. Payner*, 434 F.Supp. 113 (N.D.Ohio 1977). The Government stipulated at the post-trial hearing that the evidentiary facts found by Judge Manos could be accepted by this court, and on this basis, this court will adopt the following evidentiary facts found by Judge Manos.[2]

In January of 1973, an IRS informant located in Miami, Norman Casper, was under pressure from his IRS contacts to supply information concerning the Castle Bank and Trust Co., a Nassau company which was under investigation in connection with the use of foreign based trust funds and non-taxable foreign corporations.

Casper learned that Michael Wolstencroft, vice president of Castle Bank, would be taking a trip to the United States in January of 1973 to confer with the Levenfeld, Kanter, Baskes & Lippitz lawfirm in Chicago, and that he would be carrying bank records. Working with Special Agent Richard Jaffee, who in turn was directly supervised by Troy Register, Jr., the Chief of IRS Intelligence Division in Jacksonville, Casper devised a plan whereby he could obtain the documents from Wolstencroft.

On January 15, 1973, Wolstencroft arrived in Miami, and went to the apartment of Sybil Kennedy, a woman to whom he had been introduced by Casper in November, 1972. At 7:30 P.M., Kennedy and Wolstencroft left the apartment to go to a restaurant on Key Biscayne. They were watched at the restaurant by someone who was to notify Casper and Jaffee when they finished their dinner. Meanwhile, Casper went to Ms. Kennedy's apartment and removed Wolstencroft's briefcase. He took the briefcase to a locksmith who had been supplied by Jaffee, and then to the home of a special agent who lived nearby. Jaffee and Casper proceeded to photograph over 400 documents which were in the briefcase. The briefcase was then returned to Ms. Kennedy's apartment, and Mr. Wolstencroft proceeded on his way to Chicago without any knowledge of these events.

Within the next two weeks Jaffee informed Casper that even more information was needed. Casper accordingly arranged to have Ms. Kennedy visit Mr. Wolstencroft in Nassau. While there, she stole a rolodex file from the Castle Bank. This rolodex was duly turned over to Special Agent Jaffee. In return for these services, Casper was paid $8,000, and Kennedy $1,000.

The foregoing stipulation carries with it the conclusion that the IRS in fact engaged in illegal, reprehensible and inexcusable conduct in connection with the Briefcase Incident. It leaves unanswered the question as to what use, if any, the Government made of this material in connection with this prosecution.

### The Contents of the Briefcase

Although the Briefcase Incident has been the subject of the plethora of motions filed

---

**2.** The defendant's post-hearing memorandum asserts that the stipulation included some sort of agreement that this court would be bound by Judge Manos' finding that the IRS' conduct constituted a violation of due process and warranted exercise of the court's power to suppress evidence. This is incorrect. The parties' stipulation could and did involve only a stipulation as to the evidence presented in the hearing before Judge Manos and his determinations of fact.

in this case, no statement has ever been made as to its mysterious contents. The documents and material contained in the briefcase have been produced *in camera* and have been disclosed to the defendant Baskes but have not been put in a public file in the interest of protecting the privacy of those whose names appear. The names of at least 300 persons and a number of entities and trusts appear on page after page of the briefcase files with no identification as to any detail except an assigned number. Although addresses are given in some instances, many persons are named without any address or even a full identification. The name of Cavanaugh was an example. Although the name Cavanaugh appears standing by itself five times, no other identification or association is made. The trust in which the $700,000 was deposited is referred to simply as Trust No. T–5088.

Defendant has assiduously combed the entire file and has listed the following references to persons or entities involved in this litigation: In particular, the name Cavanaugh appears five times; Zeno, four times; Jeffrey Investment Co., four times; Zell, ten times; Fantasy-Galaxy, Inc., Fantasy-Galaxy Record Co. and its partners or related entities, including Argosy Venture, 124 times; Baskes, eighteen times; Kanter, 52 times; Hammerman, 24 times; and other partners of the defendant's lawfirm of Levenfeld, Kanter, Baskes & Lippitz, 157 times.

Although the defendant has now referred to correspondence in the file, such correspondence consists mainly of past letters between the members of the Baskes firm and the Castle Bank, and none of it reveals any information relating to the present case.

The conclusion is inescapable, from an examination of these files, that they were not prepared for the purpose of disclosing any information on their face as to the details of any particular transaction. It is apparent that other records must have been kept for that purpose, either at the Castle Bank or at the Baskes law office. These files, however, did provide the Government with the clue that a large number of United States citizens were involved with off-shore accounts.

The briefcase documents with their numerous references to members of the Baskes lawfirm also confirmed the fact, which was already known before the Briefcase Incident, that these lawyers were actively engaged in handling off-shore transactions.

### Standing Question

Although the fact appears undisputed that the Castle Bank representative was en route to the Baskes office when he was diverted in Miami, and in fact reached Chicago, defendant Baskes has presented no evidence that any of this material belonged to him or that he had any kind of possessory interest in it.

Defendant Baskes rested his claim primarily on the ground that he was a target of the search and seizure and that this gave him a sufficient standing to object to the admission of this evidence.

This court disagreed with this contention and in two separate opinions held that the defendant Baskes did not have standing under the Fourth Amendment to assert a constitutional violation on the basis of the Briefcase Affair. 433 F.Supp. 799 (N.D.Ill. 1977).

In his most recent brief, the defendant claims that the attorney-client relationship between himself and the Castle Bank could provide some kind of standing. The defendant cites *United States v. Valencia*, 541 F.2d 618 (6th Cir. 1976), in this connection. However, that case merely held that the client may challenge evidence based on a secretary's notes of meetings between the client and his attorney, and that the court would use its supervisory powers to suppress this evidence when offered against co-defendants who were not clients or parties to the conversations. This case does not alter the normal rule that the attorney-client privilege is for the benefit of the client and not the attorney; and it does not establish a new basis for vicarious standing under the Fourth Amendment.

Defendant's claim for standing based on the fact that the briefcase contained certain "correspondence" between the Baskes law-firm and the Castle Bank is without merit. The defendant's citation of *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976), does not support this theory of standing. In that case, the court found that the defendant did have Fourth Amendment standing to challenge the illegal interception of boxes of books which were en route to the defendant's store. *See also Oliver v. United States*, 243 F.2d 391 (10th Cir. 1957). It is important to note first that counsel for the defendant Baskes has specifically denied that Wolstencroft was en route to the defendant's lawfirm, and that his co-defendant, Kanter, has made similar denials to the press.[3] Moreover, even assuming that the briefcase was en route to the defendant, there are two important differences between *Kelly* and this case. First, the *Kelly* court found that the defendant there was entitled to a form of "automatic standing" because the crime with which he was charged, knowing use of an interstate carrier for the transportation of obscene materials, included his control over the books as an essential element of the offense. Thus, the case was analogous to those cases holding that defendants have automatic standing to challenge evidence when they are charged with a possessory offense. Second, the *Kelly* court found that the defendant did in fact have an independent proprietary interest in the books because they were consigned to his book store.

Accordingly, the court can find no basis in any of the new arguments advanced by defendant Baskes to change its earlier holding that the defendant does not have traditional Fourth Amendment standing to challenge the admission of evidence on the basis of the search and seizure of the documents from the briefcase and the stolen rolodex.

*IRS Activity After the Briefcase Incident*

Following the opening of the briefcase, there was a flurry of activity on the part of the IRS.

Around the end of January, 1973, Ellison was notified that Special Agent Jaffee had obtained information on the Castle Bank. In mid-February, he was shown the photographs of the documents taken from Wolstencroft's briefcase and the rolodex which had been stolen from the Castle Bank. Jaffee and Ellison then established a method for organizing the leads supplied by these materials, and became co-directors of what was variously called "Project Decode" or "Project Haven" (hereinafter "Project"). Essentially, the Project took each of the hundreds of names which appeared in the briefcase documents, prepared a "target sheet" and a file for each name, and sent them out to local IRS offices in the hopes of being able to identify taxpayers with foreign trusts in the Castle Bank. The project staff consisted of Ellison, Jaffee, one other agent and two clerical personnel. Clearly, their job was to accumulate and organize information coming from the local offices.

The IRS, with its customary bureaucratic inefficiency, failed to send any inquiry to its office in the Reno District in connection with the name of Cavanaugh. The response came from the other local offices who were being canvassed that the name Cavanaugh was too numerous to list.

*It was not until September of 1973—approximately nine months after the Briefcase Incident—that any agent of the IRS made any connection between the name of Cavanaugh and a possible off-shore transaction.*

On September 5 and 6, Silva, the international expert who had been assigned to the case to investigate the Fantasy-Galaxy return, went to view the mining claim with representatives of the Bureau of Mines. The mine appeared to have little or no value. Silva searched the records in the county recording office, and found that the mine had previously been owned by a John E. Cavanaugh. The county clerk was able to tell Silva that this was a John E. Cava-

---

**3.** See Transcript, September 16, 1977, p. 16, and November 23, 1977, and Exhibit 16 to Defendant's Motion to Suppress Evidence and to Dismiss Indictment.

naugh of Reno, Nevada. Silva then went to the local IRS office in Reno and contacted the local Revenue Agent Bowen who was conducting an audit on the Cavanaugh return. Bowen was told that Silva was looking for information which would be helpful to a national investigation of the use of foreign-based trusts and entities for the purpose of tax evasion. Silva asked Bowen to obtain copies of the Cavanaugh returns from 1969 and 1970 in order to determine if the sale of the mining claim had been reported.

On September 11, 1973, Silva called Ellison to report on what he had found out about the mine. When he was told that there was a Cavanaugh involved, Ellison recalled that that name had appeared in the briefcase.

Upon searching the records, Bowen discovered that Cavanaugh had not reported any gain from the sale of the mine. He then intensified his investigation of the Cavanaugh returns, as did Silva. Repeated contacts were made with Ed Redman, the Cavanaughs' accountant, and William Thornton, son-in-law to John Cavanaugh and attorney for the family, and with the Cavanaughs themselves. In general, these persons initially denied any knowledge of, or wrongdoing in connection with, the mine. The agents in turn indicated that the investigation would continue until the mining transaction was fully disclosed.

During this period the investigation was centered on the gold mine itself without any reference to the use of the mine in connection with the sale of the Cavanaugh property. The first vague connection that was made between the use of the mining claim and the sale of the Arlington Towers property occurred in October of 1973, when Silva learned through a newspaper account of Cavanaugh, Sr.'s death that certain property had been sold to Samuel Zell, who had the same address as the defendant's lawfirm in Chicago.

William Thornton, who had questioned the legality of the mine transaction from the outset, after being interviewed by the IRS, hurried to Chicago on January 25, 1974, to report to the defendant Baskes and to seek his advice. He was told that the Baskes' lawfirm could no longer represent the Cavanaugh group because of their employment by Fantasy-Galaxy.

Thornton then returned to Reno and subsequently employed Bernard Schoenberg on January 30, 1974. Thereafter, in April of 1974, Schoenberg, the new counsel for the Cavanaugh family, disclosed the entire substance of the transaction to Silva and the IRS agents, after negotiations leading to the settlement of claims against the Cavanaughs. This disclosure, put in writing in a memorandum dated August 13, 1974, for the first time set out every element of the complicated Arlington Towers transaction.

After a comprehensive review of the foregoing evidence, the court has concluded that the prosecution of this case in fact has stemmed from the abandoned worthless mine known as Hornet No. 2 and its fraudulent use by the defendant Baskes in connection with the Fantasy-Galaxy and Cavanaugh transactions and did not result from the information contained in the briefcase or rolodex.

In coming to this conclusion, the court has not ignored the evidence that while Silva was independently pursuing his own investigation of the $900,000 gold mine disclosed by the Fantasy-Galaxy return, the IRS agents in charge of Project Haven were busy building up their own case against Fantasy-Galaxy. In fact, Fantasy-Galaxy was used at one of the meetings attended by Silva as an example of the manner in which foreign trusts could be used for hiding funds for the purpose of tax evasion. Silva was at least made aware of some of the Project's activities as they related to Fantasy-Galaxy and also had some contacts with the Project Managers, Jaffee and Ellison, during this period.

However, entirely apart from this particular investigation by the Project, it is clear that the link between Fantasy-Galaxy, the mining claim and the Cavanaugh family resulted in the first instance from legally obtained information rather than from the briefcase or the rolodex.

It is also clear that the joint efforts of Silva and the Project Haven investigation of the IRS were still insufficient to supply the full details of the Cavanaugh transaction until the Schoenberg disclosure was made.

Defendant has attempted to blunt the force of this evidence by taking the position that the illegal briefcase material and the Project Haven activities in pursuing it were used to encourage Silva and others to pursue an investigation which they might otherwise have settled or dropped altogether as to Fantasy-Galaxy. Defendant argues that for this reason the entire investigation should be considered tainted.

This notion has been rejected in cases decided under the Fourth Amendment, and this court sees no reason to establish a different rule under the general doctrine of supervisory powers. In *United States ex rel. Owens v. Twomey*, 508 F.2d 858 (7th Cir. 1974), the court set out three bases for a finding that evidence was not tainted by illegal investigative conduct:

(1) The evidence was discovered by an independent source;

(2) The evidence is sufficiently distant in causal connection from the illegal act; or

(3) The evidence would have inevitably been discovered even without the illegal conduct.

The second ground is based on the rule that evidence may be free of taint even if it results from an investigation which would have been dropped "but for" the illegally obtained information. As the Supreme Court stated in *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."

In *United States v. Friedland*, 441 F.2d 855 (2d Cir. 1971), this rule was applied to a case where illegally obtained evidence intensified and focused an investigation which might otherwise have been dropped:

". . . we do not accept the premise that if Best's squad was put on notice, through receipt of information obtained from illegal bugging, that Friedland was the sort of person who would bear watching, this alone would immunize him from investigation of different criminal activities and from prosecution on the basis of facts about them learned in a lawful way. Judge Learned Hand wrote for this court

. . . .:

"The question therefore comes down to this: whether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped. We do not believe that the Supreme Court meant to involve the prosecution of crime in such a tenebrous and uncertain inquiry, or to make such a fetish of the statute as so extreme an application of it would demand."

(Citations omitted.) 441 F.2d at 859.

█ This court agrees that Silva and Bowen and the other investigators working on the Fantasy-Galaxy and Cavanaugh audits were "spurred on" in their investigations as a result of encouragement from the Project managers. However, it is apparent that this fact alone is insufficient to support a conclusion that the entire investigation should therefore be aborted by reason of the Government's misconduct in the Briefcase Affair. The rule of attenuation announced in *Wong Sun, supra*, and discussed in *Owens* and *Friedland, supra*, is essentially a rule of permissible factual inference, and thus it is helpful to the task before this court, to determine the nexus between the Briefcase Affair and this prosecution. The rule supports this court's conclusion that the use of the illicitly obtained information to spur on the investigation is not itself sufficient to establish a fatal entanglement.

█ Defendant also makes the claim that because of the briefcase information about

foreign trusts, Bowen and Silva were able to pressure the Cavanaughs and their attorney Schoenberg into making their disclosures in April of 1974. The evidence is unclear as to what precise information these agents had about the actual existence of a foreign trust in the name of Cavanaugh. However, there is no question that they at least used the presumed knowledge of such a trust in discussing their investigation with attorney Schoenberg.

The defendant argues that this is the type of direct use of illegally obtained evidence to pressure reluctant witnesses which must be remedied with suppression of the evidence or dismissal of the indictment.

First, it should be noted that this court has serious doubts whether, even if the defendant had Fourth Amendment standing, the Schoenberg disclosures and the evidence stemming from them would be considered "tainted". The question would depend on whether the decision to disclose was an independent act of will such as would dissipate the taint. In *United States v. Hoffman*, 385 F.2d 501 (7th Cir. 1967), the Seventh Circuit found such an independent act of will in the decision of one witness, who had been illegally arrested, to plead guilty and testify against his associates. The finding that the Cavanaughs and their attorney Schoenberg independently decided to disclose the transaction is supported by evidence presented during the trial which showed that the Cavanaughs were uneasy with the transaction almost from the beginning, and that at least once they asked the defendant's firm if they should obtain outside counsel just to check to make sure the transaction was legal.

Thus, a reasonable assumption can be made that the Cavanaugh family was prepared to confess their involvement in the transaction even without the mention of the Bahamas trust. In any event, the court finds that this evidence would be. insufficient to warrant the suppression of all of the testimony secured from the witness Thornton.

After reviewing the evidence and considering the defendant's arguments, it is this court's conclusion that the indictment in this case was not derived from the information contained in the briefcase or the rolodex. It is equally clear that the bulk of the Government's evidence in this trial came from William Thornton, who was the copious note-taker, covering every step of this complicated scheme. The Government has demonstrated that the indictment and ·evidence used in this prosecution came from sources independent of the briefcase and the rolodex.

### The Question of the Use of the Court's Supervisory Powers

Defendant in his post-trial and post-suppression hearing motions has reasserted his claim that this court should exercise its supervisory powers to vacate the guilty verdict and either dismiss the indictment or order a new trial. Defendant asserts two grounds to justify the use of this extraordinary sanction: (1) Prosecutorial misconduct in falsely assuring the defendant Baskes that he was not a target of the investigation when he appeared before the grand jury on March 28, 1974; and (2) The misconduct of the IRS in the Briefcase Incident.

### The Alleged Grand Jury Misconduct

Defendant Baskes was served with a forthwith subpoena duces tecum returnable March 28, 1974, calling for the production in Chicago of voluminous documents relating to the Castle Bank.

The special attorney delegated to attend this grand jury session was Paul Schaeffer, who was given his assignment only two to three days before the scheduled session. Schaeffer testified that he had no familiarity whatever with the investigation prior to that time.

The subpoenaed witness Baskes and his attorney, Ira Burman, appeared at the U. S. Attorney's Office on the scheduled date, *without any of the records called for in the* subpoena. Schaeffer and Burman had met each other on prior occasions in connection with other tax investigations.

An inquiry was made by Burman as to whether his client was a target of the investigation. There is some dispute as to precisely what was said by Schaeffer in response to this inquiry. Schaeffer admits that he did tell Burman that he was unaware of any information indicating that Baskes was engaged in criminal activities. Schaeffer also gave unequivocal testimony that he offered to give the witness Baskes his constitutional warnings before the grand jury and that both Baskes and Burman declined the offer. Burman's recollection is that this offer was never made. Irrespective of which version of this transaction is accepted, the court's conclusion is that there was no deliberate intention on the part of the prosecutor to mislead the witness for the purpose of obtaining evidence against him.

After this brief exchange, the witness Baskes made his appearance before the grand jury. The fifteen-page transcript contains general questions relating to the procedure to be followed in producing the documents called for by the subpoena and some specific questions as to the witness' relationship with the Castle Bank and particularly with the deposits of that Bank located in two Chicago banks, as shown by records already in the hands of the IRS.

Another area of dispute between the parties is whether these additional questions were "off limits". Burman claims that after Baskes reported these questions to him following the hearing, he registered a complaint with Schaeffer. Schaeffer on his part denies that any complaint was ever made.

The thin thread of recollection of past events is too frail to justify a definite credibility assessment between equally credible counsel. What is clear, however, is that none of the answers given by the witness Baskes in the short grand jury session furnished any evidence for the Government in its prosecution.

## The Briefcase Affair

This court earlier stated that it would consider the appropriateness of the use of its supervisory powers in this case only in the context of the evidence received at the trial. 433 F.Supp. at 809.

The reason for that ruling was to test the claim made by the defendant Baskes that the indictment itself and much of the Government's evidence directly stemmed from the Briefcase Incident. That claim has now been found to be unsubstantiated, and it is in that posture that the supervisory powers issue will be re-examined.

■ The purposes served by the supervisory powers doctrine are fairly clear; they are the preservation of judicial integrity and the deterrence of future official misconduct. However, the test to be applied in each case is very vague indeed, partly because there are very few cases in which the power is actually exercised. In most instances the power is acknowledged but the courts have declined to use it, see, e. g., *United States v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334 (1974). Thus far, the only articulated test is whether the official misconduct "shocks the conscience", *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). *See also United States v. Archer,* 486 F.2d 670, 677 (2d Cir. 1973).

The application of this test presents the problem that, in most cases, judges would have differing responses to various types of official misconduct, and would reach inconsistent and unprincipled results if left to apply the seemingly subjective test of whether certain conduct "shocks the conscience." Justice Clark expressed this concern in his concurrence in *Irvine v. California,* 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), a case in which the Court declined to exercise its supervisory powers to suppress evidence which was obtained through illegal police conduct, including several surreptitious breaking and entries and unauthorized electronic surveillance:

"Of course, we could sterilize the rule announced in *Wolf* [*Wolf v. People of State of Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782] by adopting a case-by-case approach to due process, in which inchoate notions or propriety concerning

local police conduct guide our decisions. But this makes for such uncertainty and unpredictability that it would be impossible to foretell—other than by guesswork—just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution. In truth, the practical results of this *ad hoc* approach is simply that when five Justices are sufficiently revolted by local police action, a conviction is overturned and a guilty man may go free. *Rochin* bears witness to this. We may thus vindicate the abstract principle of due process, but we do not shape the conduct of local police one whit; unpredictable reversals on dissimilar fact situations are not likely to curb the zeal of those police and prosecutors who may be intent on racking up a high percentage of successful prosecutions." 347 U.S. at 138, 74 S.Ct. at 386.

In *Irvine* itself, the Supreme Court apparently limited application of the supervisory powers doctrine to cases which involved "coercion, violence or brutality to the person." 347 U.S. at 133, 74 S.Ct. at 383.

Courts of appeals have had the same difficulty in applying the Rochin test. It is hard to say, for example, why the defendants in *United States v. Valencia,* 541 F.2d 618 (6th Cir. 1976), were entitled to suppression of evidence obtained in violation of their co-defendant's attorney-client privilege, while the defendant in *United States v. Parker,* 530 F.2d 208 (8th Cir. 1976), was not entitled to suppression of evidence illegally seized from his co-defendant.

▮ Indeed, the defendant here is asking this court to extend the doctrine of supervisory powers beyond that applied by any other court. The Seventh Circuit has specifically declined to dismiss the indictments in two recent cases which involved misconduct equally, if not more, aggravated than was shown in this case. In *United States v. Balistrieri,* 403 F.2d 472 (7th Cir. 1968), vacated and remanded, 395 U.S. 710, 89 S.Ct. 2032, 23 L.Ed.2d 654 (1969), on appeal from proceedings on remand, 436 F.2d 1212 (7 Cir. 1971), the court declined to exercise its supervisory powers to reverse a conviction where the defendant proved that the FBI had broken into private premises, for the purpose of installing electronic surveillance devices, not only of the defendant, but also of a co-defendant, and of the defendant's attorney. The Seventh Circuit held that although any evidence derived from the electronic surveillance should be suppressed, the official misconduct did not warrant dismissal of the entire prosecution, or suppression of all the evidence against the defendant. Similarly, in *United States v. Fidanzi,* 411 F.2d 1361 (7th Cir. 1969), the Court of Appeals declined to establish a new rule that proof of illegal wiretapping requires dismissal of the indictment even where that conviction is based on evidence derived from sources independent of the illegality.

The only case which lends some support to the defendant's claim is *United States v. Payner, supra.* In that case, Judge Manos did hold that the suppression of evidence was warranted by the due process clause and the supervisory powers doctrine. However, in that case, the court found that substantially all of the evidence offered by the Government was derived directly from the information which was obtained from the stolen briefcase and rolodex.

The application of the supervisory powers doctrine in this case would constitute, in essence, a circumvention of the Fourth Amendment standing requirement discussed above. The early Supreme Court cases applying the supervisory powers doctrine, *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), might be at least in part explained by the fact that the exclusionary rule was still in the process of development. The conduct which was considered in those cases, coercive questioning and wiretapping, is now clearly proscribed by the Constitution. In comparison, the defendant's difficulty in this case is not that the official misconduct is not a constitutional violation, but rather that he does not have standing to assert it.

Thus, the court is asked to establish a rule circumventing the normal standing requirements, one which would seem to be in direct conflict with the Supreme Court's position as stated in *Alderman v. United States,* 394 U.S. 165, 174–75, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969):

> "The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth."

It is the judgment of this court that this case is not one appropriate to the establishment of new breadth for the supervisory powers doctrine.

Under the circumstances of this case, defendant Baskes is not entitled either to a suppression of the evidence at trial or a vacation of the jury's verdict by reason of the misconduct of the Government in the Briefcase Affair.

### Addendum

■ This court will take judicial notice that the Internal Revenue Service involvement in the notorious Briefcase Affair has already received the critical attention of the Congress. A large portion of the evidence dealing with that incident was heard by the Rosenthal Committee.

In addition, the Internal Revenue Service has been subject to sharp criticism for its outrageous misconduct by the news media.

The heat of this criticism became intense enough to produce a statement by Donald C. Alexander, the then Director of the Internal Revenue Service that "I believe very firmly that the IRS should not violate laws to enforce the law."

This concerted public action should be a sufficient deterrent against another briefcase affair or similar misconduct on the part of the Internal Revenue Service. Although deterrence may have been accomplished, the ends of justice would be better served if appropriate action was taken against the agents involved in this admitted illegal activity.